**UNITED STATES of America, Appellee,**

v.

**Guy Joseph DUCHI, Appellant.**

No. 89–5153MN.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 15, 1989.

Decided July 2, 1990.

Bruce H. Hanley, Minneapolis, Minn., for appellant.

Jon M. Hopeman, Minneapolis, Minn., for appellee.

Before LAY, Chief Judge, and ARNOLD, Circuit Judge, and LARSON,[*] Senior District Judge.

ARNOLD, Circuit Judge.

Guy Joseph Duchi was convicted of acquiring cocaine and intending to sell it. This case is about the constitutionality of the searches during which the police gathered the evidence of his crimes. Because the officers' entry into Duchi's home violated the Fourth Amendment, we reverse Mr. Duchi's conviction and remand for a new trial.

## I.

This case begins with an undeliverable package. A parcel addressed to C. Conrad, 318 Lowry Avenue North, Minneapolis, Minnesota, was shipped "next-day air" through the United Parcel Service. A delivery was attempted, but no one was available to accept the package at the Lowry Avenue address—the Reflections bar. The UPS driver noted on his delivery form that an individual outside that address didn't know anyone associated with the bar by the name of C. Conrad. At the UPS office in Minneapolis undeliverable packages are sent to post clerks such as Diane Dickenson. It is their responsibility to find out where such parcels came from and where they are going. The record reflects that Ms. Dickenson has handled over forty thousand undeliverable items for UPS. T. 141.

Ms. Dickenson received this package and, as is her practice, opened it, attempting to locate a sender's address or more informa-

tion about the intended recipient. She did not find any such information. Instead, she found two brick-like objects covered with several layers of wrapping. Starting with the outermost layer, there was a large clear plastic bag, then a layer of cellophane covering each brick, and finally a Spanish-language newspaper wrapped around each brick. Ms. Dickenson noticed a small triangular tear in one of the newspaper wrappings. A firm white substance was revealed beneath the still-attached flap of the tear. Suspecting either a bomb or drugs, Ms. Dickenson alerted the loss-prevention supervisor: Scott Larson. He examined the parcel, its contents, and its delivery history. Larson concluded that it contained contraband, and notified the narcotics unit of the Hennepin County Sheriff's Office.

Two officers responded. They examined the package and its suspicious contents, and also concluded that narcotics were likely contained in the two bricks. By sampling one of the bricks through the tear in the newspaper wrapping (after removing the two layers of clear plastic), the officers determined that the bricks were indeed cocaine. They then removed the package and its contents to their office. The officers then removed another sample from the bricks, and sent it to their crime lab to verify the field test. It was now around mid-day.

At this point, the officers began to piece together their suspicions about whose package this was. Based on prior criminal investigations they knew several relevant facts. Constance Conrad held the liquor license for the Reflections bar, the package's intended destination. Conrad lived with Joseph Duchi at 3422 Newton Avenue North in Minneapolis. A little over a year before both Conrad and Duchi had been arrested and questioned about harboring an escaped fugitive. Their home and cars were searched. They were also suspected of possessing drugs, but the searches failed to turn up any contraband. Since

---

[*] The Honorable Earl R. Larson, Senior United States District Judge for the District of Minneso-

ta, sitting by designation.

that time, a neighbor had come forward and admitted that he had done two things on the day of that arrest and search: alerted Duchi and Conrad to the police surveillance, and removed cocaine and a pistol from their residence.

Based on all this information, the Hennepin County officers focused their investigation of the package on Duchi and Conrad. Surveillance of the Reflections bar began almost immediately after the field test of the parcel. Officers were also dispatched to the Duchi–Conrad residence to monitor any comings and goings. Meanwhile, UPS had received at least two phone calls inquiring about the package. Each time he called, the male caller had identified himself as C. Conrad, and left two phone numbers where he could be reached. UPS supplied these numbers to the police around 2:30 that afternoon. The officers traced the numbers through the local phone company. One number was listed at 3422 Newton Avenue North, the Duchi–Conrad residence, the other at 318 Lowry Avenue North, the Reflections bar.

After yet another call was taken by UPS, the officers decided to return the package. Their aim was to confirm the identity of the recipient by allowing a controlled pickup. Before resealing the package, the officers substituted a book for one of the cocaine bricks. That brick was retained by the police. Under police supervision, UPS notified the male caller that the package could be picked up at any time. The man stated that he would be there shortly. It was now a little after 5:00 P.M. Surveillance was in place at the residence and the bar, and officers were also waiting at UPS.

Around 5:45 Conrad collected the parcel from the UPS office. She was followed to her home, where she arrived a little after 6:00 P.M. Duchi's black Cadillac was parked at the house. Mindful of Duchi's earlier behavior of disposing of drugs when

alerted to police surveillance, and that he was probably in the house with the drugs, the officers feared that the evidence of Duchi's crime was in danger. The officer in charge decided to enter without a warrant. At approximately 6:10 the officers entered the premises and announced their intentions. Conrad was on the back porch about to barbecue supper; Duchi was in the living room holding his infant son and visiting with two friends; the package was on the dining room table, unopened.

A security sweep of the residence revealed that no one else was present. The officers requested Duchi's consent to a search of the house, noting that a warrant application would be made if he refused. Duchi said he wanted to talk to his lawyer before cooperating. The officers again asked for his consent to search the premises. Duchi eventually signed a consent form.

The search turned up several items in addition to the package: small amounts of cocaine and methamphetamine, drug paraphernalia, a loaded .38 revolver (found underneath a dresser in one of the children's bedrooms), and two rolls of large amounts of cash. Duchi identified one of those bundles as the till money to open the Reflections bar. He prevailed on the officers not to confiscate it by promising to reveal as yet undiscovered drugs in the house. The officers agreed. They also found evidence of a recent trip by Duchi to California: a motel receipt and plane tickets.

## II.

Duchi was initially indicted on six counts of narcotics and firearms offenses stemming from the parcel of cocaine.[1] A superseding indictment added to these charges three additional narcotics-trafficking and firearms counts. These new counts arose out of the March 1987 events

---

**1.** He was charged under 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) and 18 U.S.C. § 2 with possessing one kilogram of cocaine with the intent to distribute the drug, under the same statutes with the attempt to possess and distribute two kilograms of cocaine, under 18 U.S.C. § 924(c)(1) with using and carrying a firearm during a drug-trafficking offense, under 18 U.S.C. § 1952(a) with twice traveling in interstate commerce (to and from California) in furtherance of illegal narcotics activity, and under 18 U.S.C. §§ 922(g) and 924(e)(1) with illegally possessing a firearm (since Duchi is a convicted felon).

when Duchi disposed of evidence through his neighbor. Three hearings were held on the defendant-appellant's motions to suppress. Duchi sought to exclude all the evidence gleaned from the initial search of the package, the warrantless entry into the Duchi–Conrad home, and the search of that home.

A magistrate recommended denying each of these motions. She reasoned that the search of the package (including the field test) was justified because it did not exceed the scope of the private search already completed by the UPS employees. Further, she found that exigent circumstances justified the warrantless entry into the Duchi–Conrad residence. Finally, she resolved the conflicting testimony regarding the voluntariness of Duchi's consent to the search of the house in favor of the officers.

The District Court followed the Magistrate's reasoning and recommendations, and all this evidence came in against Duchi at trial. That trial began with a jury, but the jury was dismissed when the parties agreed to submit the case to the District Court on a stipulated (partial) set of facts. The Court found Duchi guilty on the six counts initially charged, and not guilty on the three counts added in the superseding indictment. The District Court sentenced Duchi to a total of twenty-eight years in prison.[2]

### III.

Duchi assigns three errors on appeal. First, he claims that the searches in this case (of the package and of his house), and the warrantless entry into his home, are constitutionally impermissible. He argues that the evidence secured in those searches, and from that entry, should therefore not have been admitted against him. Second, Duchi asserts that his convictions for both the possession and intended distribution of narcotics, and the attempt to commit the same crime, violate the constitutional prohi-

bition on double jeopardy. Finally, he challenges the sufficiency of the evidence supporting his separate convictions for the possession and the use of a firearm. Because we partially agree with Duchi's first claim, and accordingly reverse his convictions because of the illegality of the warrantless entry into his home, we do not reach his double-jeopardy or sufficiency-of-the-evidence claims.

■ Duchi first questions the officers' search of the package. While the parcel was at the UPS office, its contents were examined by the police and field tested for cocaine. The Magistrate found that "the narcotics officers did not go beyond the scope of the private search when they removed a sample of the already visible suspected contraband for chemical testing." Report and Recommendation 12. The District Court adopted that finding. The appellant points to the following testimony of Officer Salitros, who did the test, in arguing that the District Court clearly erred in accepting the Magistrate's finding.

Q: Do you know whether you opened the package to any greater extent than Mr. Larson at UPS did?

A: I'm sure I did because we took a little sample from it and field tested it there at UPS.

T. 135.

We agree with the Magistrate and District Court that the officers' search was reasonable: it did not materially exceed the scope of the private search already completed by UPS. This case is virtually on all fours with *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). Just as in *Jacobsen,* a private search revealed a substance that appeared to be contraband. The police were summoned. A trace amount of the plainly visible and suspicious substance was removed for testing. In *Jacobsen* that removal was arguably even more intrusive: there a plastic bag was opened to reach the suspicious

---

**2.** Specifically, Duchi received three concurrent terms of twenty-three years for possession with intent to distribute, attempted possession and distribution, and possession of a firearm by a convicted felon. He received two concurrent five-year sentences for the interstate travel counts. Duchi also received one five-year sentence, to be served consecutively, for use of a firearm during drug trafficking.

substance, here once the clear outer layers of wrapping were removed, an existing tear in the inner wrapping allowed the officers access to the substance. The officers' final step—testing that substance to confirm or reject their reasonable suspicions—was explicitly approved by the *Jacobsen* Court. The Court reasoned that under these circumstances of prior private discovery, chemical testing was a *de minimis* intrusion, not prohibited by the Fourth Amendment. *Id.* at 126, 104 S.Ct. at 1663.

Rather than revealing any constitutional error, officer Salitros's testimony confirms his use of the investigative tactic accepted in *Jacobsen.* And, of course, once the field test exposed the true character of its contents, any expectation of privacy in the parcel evaporated, validating its seizure and removal by the officers. Duchi's assertions of error in the initial search of the package are thus without merit.

Duchi next questions the officers' warrantless entry into his house after Ms. Conrad had picked up the parcel and returned to their home. The Magistrate recommended, and the District Court found, that the officers' entry was justified by an exigent circumstance: the officers' reasonable fear that the evidence would be destroyed before a search warrant could issue. The Magistrate's analysis (also adopted by the District Court) focused on these facts known to the police prior to the entry: Duchi's probable presence in the house, Duchi's known propensity for getting rid of evidence when alerted to police surveillance, and the altered parcel's presence in the house. According to the investigating officers, these circumstances were cemented by the felt lack of time to secure a warrant—because until the pick-up and delivery took place, they were uncertain of the parcel's owner and destination. Emphasizing this lack of time, the Magistrate concluded that the officers' entry was justifiable. We are unpersuaded, however, that exigent circumstances justifying a warrantless entry exist in this case.

We begin with the relevant constitutional text. The Fourth Amendment to the federal Constitution provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

"The point of the Fourth Amendment, which is often not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence." *Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948) (Jackson, J.). Rather, the Fourth Amendment's "protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged" by the investigating officer. *Ibid.*

■ Thus the often affirmed principle: a warrantless entry into or search of someone's home is *per se* unreasonable, absent exigent circumstances. See, *e.g., Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).[3] That narrow exception countenances warrantless entries because of the urgency of the situation. The warrant requirement is suspended when—in the press of circumstances beyond a police officer's control—lives are threatened, a suspect's escape looms, or evidence is about to be destroyed. *United States v. Clement,* 854 F.2d 1116, 1119 (8th Cir.1988) (citations omitted). The exigent-circumstances requirement applies even when, as in this case, probable cause for the arrests clearly exists.

■ The circumstances relied on by the District Court are not exigent. The urgency that would justify allowing the police officers, rather than a neutral judicial officer, to draw the reasonable inferences supporting this entry is not present in these facts. The overarching circumstance relied upon by the Government is the time ele-

---

**3.** Consent can also justify a warrantless entry into a home, but there is no contention here that Duchi consented to the officers' initial entry.

ment involved. Until Conrad obtained the package and carried it home, the officers argue, they did not know enough details to get a warrant to enter and search the Du-chi–Conrad residence. That is surely right. But this explanation belittles the officers' efforts throughout the afternoon.

Their investigation focused on Conrad and Duchi by noontime. Surveillance of the Reflections bar also began around mid-day. Conrad and Duchi's connections to the bar, the address on the package, were well known to the police. Surveillance of the Duchi–Conrad residence was intermittent throughout the afternoon, and ongoing after 4:00 P.M. Duchi's car was at their house. The three phone calls to UPS about the missing package linked those two addresses, and a male caller (falsely identifying himself as C. Conrad), to the parcel. Moreover, the officers had repeated contacts with an assistant U.S. Attorney throughout the afternoon. Those conversations supplemented the officers' observations with information about Duchi's prior narcotics activity.

■ These interlocking facts support focusing the investigation, as the officers did, on Duchi and Conrad. These facts—all revealed hours before Conrad picked up the package and went home—are also the beginnings of a warrant application. Federal Rule of Criminal Procedure 41 provides for oral testimony by phone to supplement and complete a warrant application. This case presents "circumstances [that] make it reasonable to dispense with a written affidavit" in applying for a warrant. Fed.R. Crim.P. 41(c)(2)(A). It is also reasonable to expect the officers here to have started the warrant-application process after their investigation focused on Duchi and Conrad, and their home and business. The process could have been completed by radio or phone when the package was taken to their residence. And while the opportunity to seek a warrant is not determinative, *United States v. Palumbo*, 735 F.2d 1095, 1097 (8th Cir.), *cert. denied*, 469 U.S. 934, 105 S.Ct. 332, 83 L.Ed.2d 268 (1984), it is certainly relevant when exigent circumstances are pleaded. *Ibid.*

The Government's reliance on *United States v. Gallo–Roman*, 816 F.2d 76 (2d Cir.1987), for its contrary interpretation of these facts is misplaced. In *Gallo–Roman*, the investigation had no definite focus on either individuals or places, and indeed the package went astray to an entirely unexpected location. Those differences make that case inapposite here. Nor does our recent decision in *United States v. Johnson*, 904 F.2d 443 (8th Cir.1990) control. This is not a case like *Johnson* where the investigation had no focus, and the identity of the individuals and places involved had yet to be discovered. Rather, this case is like the hypothetical we alluded to in *Johnson*, where a claim of exigent circumstances would likely fail. Here we have identifiable individuals at accurate addresses, with a delivery occurring "during the denouement of a governmental investigation" of those people and those addresses. *Johnson*, 904 F.2d at 445.

The second circumstance the District Court found supporting this warrantless entry was the investigating officers' knowledge of Duchi's previous (successful) "effort to dispose of narcotics evidence once surveillance had been discovered...." Report and Recommendation 15. The details of that effort, however, undermine the officers' reliance.

On March 7, 1987, officers of the Hennepin County Sheriff's Department had the Duchi–Conrad residence under surveillance. The police suspected Duchi of harboring a fugitive—Cecil Hogg. Duchi's neighbor, Daniel Petro, came home and noticed the surveillance. He knocked on Duchi's back door, entered, and then left a few minutes later carrying a brown satchel. After securing search and arrest warrants, the officers entered the house and arrested Duchi and Hogg. Petro initially denied any complicity. The neighbor claimed that his brother was the one who visited Duchi. Petro later admitted his role and turned over the brown case to police. It contained a revolver and a kilogram of cocaine.

Petro's effort shows Duchi's tendency to dispose of narcotics evidence, and it demonstrates a particular way of achieving that

goal. Duchi could have destroyed the cocaine; instead he had it removed from the scene. Based on the Petro incident (the facts of which the assistant U.S. Attorney conveyed to the police that afternoon), it would have been reasonable for the officers to fear a similar response. They should have feared that Duchi would attempt to have the evidence removed from his home—not destroy it—once he discovered the alteration or the surveillance. That possibility was well guarded against, considering the fourteen officers watching Duchi's house after Conrad returned home with the package. The officers' knowledge of the previous incident would have justified arresting anyone leaving the residence with the evidence while a warrant application was in progress. That knowledge does not, however, help establish exigent circumstances justifying a warrantless entry into the home.

The third and final circumstance the Government points to in justifying the entry is the parcel's altered contents. Recall that before the package was returned to UPS to be picked up, one of the cocaine bricks had been removed and replaced with a book of nearly equal weight. The other brick was also initialed by one of the investigating officers. The Government argues that these alterations would have warned Duchi that the jig was up as soon as he opened the parcel. Once the altered package was inside Duchi's home, probably in his hands, the risk of destruction obtained. Thus the officers' warrantless entry to protect the evidence of Duchi's crime.

This rationale misunderstands the exigent-circumstances exception to the Fourth Amendment's warrant requirement. We have recently held, adopting the view consistently taken by our sister circuits, that the situations of urgency protected by this exception cannot be created by police officers. *United States v. Johnson*, 904 F.2d 443 (8th Cir.1990); see also *United States v. Thompson*, 700 F.2d 944, 950 (5th Cir. 1983) (citing cases).

▮ This general holding will not dispose of this case or, in fact, of many cases. For in some sense the police always create the exigent circumstances that justify warrantless entries and arrests. Their discovery of the criminal causes him to flee; their discovery of the contraband causes the criminal's attempt to destroy or divert the evidence. For the claim of exigent circumstances to be adequately evaluated, the better question to ask is: how did those urgent circumstances come about? This antecedent inquiry—into the reasonableness and propriety of the investigative tactics that generated the exigency—seems to be what courts have in fact been doing in these kinds of cases. See, *e.g.*, *United States v. Zabare*, 871 F.2d 282, 290 (2d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 161, 107 L.Ed.2d 119 (1989) (accepting the District Court's determinations that officers' decision to "void" airline tickets delivered during a controlled buy to prevent public dissemination was "reasonable," before concluding that exigent circumstances justifying a warrantless entry were present); *United States v. Munoz–Guerra*, 788 F.2d 295, 298–99 (5th Cir.1986) (rejecting agents' approach to a patio door as unreasonable when many other opportunities existed for surveillance of weapons cache, before finding that exigent circumstances justifying a warrantless entry were not present when the occupant was thereby alerted to the agents' presence).

We adopt this antecedent inquiry into the appropriateness of investigative tactics as the principled way to evaluate whether the officers created the exigent situation. There is no question that the deliberate creation of urgent circumstances is unacceptable. See *Thompson*, 700 F.2d at 950. But bad faith is not required to run afoul of the standard we adopt and apply today. As Justice Jackson noted, the danger to constitutional rights more often comes from "zealous officers" rather than faithless ones. *Johnson*, 333 U.S. at 13, 68 S.Ct. at 369. There is no assertion or proof of such a contrived exigence in this case. We take Detective Fontana, the officer directing the Duchi–Conrad investigation, at his word: one kilo of cocaine was removed and retained for use as evidence, lest the whole parcel be lost or destroyed after delivery. T. 27.

The difficulty with this removal and replacement of evidence lies in its reasonably foreseeable consequences. People open the packages delivered to them. This drastic alteration of the package's contents guaranteed that the recipient would be alerted to the investigation upon opening the box. Though this might have happened sooner or later, given the contents, the officers reasonably feared that the package would be opened immediately, and the contents swiftly disposed of. That immediate danger is one of the crucial circumstances pointed to by the officers that prevented them from securing a warrant. The heightened danger of destruction upon discovery was, however, reasonably foreseeable; it was, in fact, the replacement strategy's probable result. Since that danger was created by the officers' investigative strategy, it cannot justify their warrantless entry.

▮ The evidence used to convict Duchi on all counts was gained after the illegal entry into his home. That evidence included the one kilogram of cocaine left in the package, the plane tickets and motel receipt from Duchi's trip to California, and the loaded revolver. Duchi's presence further connected him with the package and its delivery. The District Court erred in not suppressing all these items at Duchi's trial. They bear the taint of the unjustified entry into Duchi's home. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Williams*, 604 F.2d 1102 (8th Cir.1979). Nor can Duchi's subsequent consent right the officers' constitutional wrong. The appellant's acquiescence came immediately on the heels of the illegal entry. We are firmly convinced it would not have been given but for the officers' unjustified presence in Duchi's home.

\*  \*  \*

We reverse Duchi's convictions on all counts because the evidence used to convict him was the fruit of a warrantless entry without exigent circumstances. The District Court erred in not granting the appellant's motion to suppress this evidence. The Government is, of course, free to retry the appellant. It must, however, prove the case against Duchi without the benefit of the evidence gained from unconstitutionally entering his home.