UNITED STATES of America, Appellee,

v.

Jeffrey JOHNSON, Appellant.

UNITED STATES of America, Appellee,

v.

Thomas ASH, also known as Rhymale Butler, Appellant.

Nos. 92–3777, 92–3778.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 16, 1993.

Decided Dec. 21, 1993.

Rehearing Denied in No. 92–3777 Feb. 4, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied in No. 92–3778 Feb. 23, 1994.

William L. Gavras, St. Louis, MO, for Jeffrey Johnson.

Frank R. Fabbri, III, St. Louis, MO, for Thomas Ash.

Sam C. Bertolet, Asst. U.S. Atty., St. Louis, MO, argued (Kenneth R. Tihen, Asst. U.S. Atty., on the brief), for appellee.

Before McMILLIAN, WOLLMAN, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

WOLLMAN, Circuit Judge.

In these consolidated appeals, Thomas Ash and Jeffrey Johnson appeal from their convictions for conspiring to attempt to possess with intent to distribute in excess of fifty grams of a substance containing cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(iii), and 846; attempting to possess with intent to distribute in excess of fifty

grams of a substance containing cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(iii), and 846; and using a communication facility in attempting to possess with intent to distribute in excess of fifty grams of a substance containing cocaine base, in violation of 21 U.S.C. § 843(b). We reject their argument that section 841(b)(1)(A)(iii) is unconstitutional. We find persuasive, however, their argument that evidence obtained following a warrantless entry into a residence should have been suppressed. Nonetheless, we find that the untainted evidence was so compelling as to render harmless the admission of the illegally-obtained evidence. We also reject the two sentencing challenges raised. Accordingly, we affirm the defendants' convictions and sentences.

## I.

A United States postal inspector in New York received information that a black man wearing a black jacket would mail a package containing crack cocaine to St. Louis from the Uniondale, New York post office. On May 9, 1991, a man fitting this description entered the Uniondale post office and mailed via Express Mail a package addressed to Mrs. Rhymale Buttler,[1] 2909 Old Hanley Road, St. Louis, Missouri 63114. The package was removed from the regular mail stream and sent directly to Rod Damery, a postal inspector in St. Louis.

After a narcotics-trained dog indicated that the package contained drugs, Damery applied for and obtained a search warrant for the package. When Damery and another inspector opened the package, they found eighteen plastic bags of cocaine base, or crack, wrapped inside a knit sweater. The package also contained National Supermarket grocery bags and foam as packing material. Planning to execute a controlled delivery, the inspectors removed all but one of the bags and replaced them with a bag of taffy. Additionally, they placed in the package a transmitter, or beeper, which would signal when the package was opened. They then rewrapped the package as it originally appeared.

When a postal inspector dressed as a letter carrier delivered the parcel on May 10, Ash accepted and signed for it, indicating that he was Rhymale Butler. During the delivery, Postal Inspector Ed Moreno was waiting at the federal court house, where he was to apply for a search warrant as soon as he learned that the parcel had been delivered and taken inside the residence. Within minutes of the delivery and as Moreno was being informed via radio that the package had been accepted, the beeper indicated that the package had been opened. Fearing that evidence would be destroyed, the inspectors decided to enter the residence without waiting for the search warrant to be issued.

Postal Inspector Jerry Post knocked on the door and announced his identity. Receiving no response, he forced the door open. Upon entering the house, he observed the bathroom door closing. He and another officer then forced their way into the bathroom. They observed Johnson attempting to flush the bag of taffy down the toilet and Ash standing in the bathtub. As Johnson flushed the toilet, Post removed the bag from the toilet and threw it on the floor. Post then wrestled with Johnson as he attempted to escape through a window in the bathroom. Johnson was ultimately subdued, and he and Ash were arrested.

The search warrant for the residence was issued some ten minutes after the officers initially entered the house. Postal inspectors then searched the house pursuant to the warrant. In the bedroom where Ash's girlfriend and child were staying, Inspector Post found inside a lock box a small portable scale of the type commonly used by drug dealers. He also found in a second lock box small baggies used to package crack and records for a pager in the name of Rhymale Butler. Additionally, Post discovered a piece of paper containing names, dollar amounts, and terms relating to drug quantities. Inspectors recovered the opened package and the sweater in the bathroom, as well as a pager that matched the pager records found in the bedroom.

1. Thomas Ash is also known as Rhymale Butler.      Butler was spelled with two T's on the package.

At Ash and Johnson's bench trial, Mr. Kim Smith, a cooperating witness who lived in the residence located at 2909 Old Hanley Road, provided the following testimony. Johnson, who had recently moved from New York, and Ash spent considerable time at the residence. In early May 1991, Smith observed them looking for a box to send money to New York. They found a baby formula box and placed in it a large amount of cash, a sweater of Johnson's, some National Supermarket grocery bags, and some foam. (At trial, Smith identified the seized box, the foam inside the box, and the recovered sweater as the same items that Ash and Johnson had initially mailed to New York.) Smith drove the two defendants to the United Parcel Service office on Jefferson Avenue in St. Louis, where Ash mailed the package. The next day Smith overheard a telephone conversation in which Ash and Johnson told Johnson's brother, who lived in New York, that the package was on its way. On May 6, or 7, Smith again observed the defendants placing money in a box so that they could mail it. On May 10, after Ash accepted the parcel from the disguised postal inspector, he and Johnson immediately took it into the bathroom.

Smith's testimony was corroborated by independent sources. For example, the government· presented UPS records indicating that on May 3, and May 6, 1991, one Rhymale Butler had sent a package from the UPS office on Jefferson Avenue to Samuel Johnson, 1288 Warwick Street, Uniondale, New York. Additionally, the government offered the testimony of Sharon and Nicole Baird, who in May 1991 lived at 1288 Warwick Street. The Bairds testified that they had rented the lower portion of their home, which is eight-tenths of a mile from the Uniondale post office, to a Samuel Johnson. They recalled that Johnson had received two packages via UPS from St. Louis in early May. Nicole Baird specifically remembered that one of the packages was a brown baby food box.

The district court convicted Ash and Johnson of the three above-described. offenses. The court sentenced Ash to 200 months' imprisonment, to be followed by five years of

supervised release, and Johnson to 228 months' imprisonment, also to be followed by five years of supervised release.

## II.

█ Ash and Johnson first argue that 21 U.S.C. § 841(b)(1)(A)(iii) is unconstitutional as applied. Section 841(b)(1)(A)(iii) provides that a person convicted of an offense involving more than fifty grams of a substance containing cocaine base shall be sentenced to at least ten years' imprisonment. Citing evidence that blacks are prosecuted much more frequently than whites for cocaine-base felonies and that the penalties for these offenses are more severe than the penalties for cocaine-powder offenses, Ash and Johnson argue that this section has been applied in a discriminatory. manner against blacks, contending that the. United States Attorney's Office for the Eastern District of Missouri has employed this section to purposefully discriminate against blacks. They state that since 1988 nearly 100% of cocaine-base prosecutions in the district have been against blacks, whereas 69% of cocaine-powder prosecutions have been against blacks.

In *United States v. Willis,* 967 F.2d 1220, 1225 (8th Cir.1992), and ·*United States v. Simmons,* 964 F.2d 763, 767 (8th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 632, 121 L.Ed.2d 563 (1992), the defendants cited similar statistical evidence. In both cases, we held that we were bound by precedent to reject their constitutional challenges to the severe sentences for crack cocaine. Likewise in this case, although Ash and Johnson have compiled an impressive array of statistical data, we must reject their constitutional claims. "[E]ven if a neutral law has a disproportionately adverse impact upon a racial minority, it is unconstitutional ... only if that impact can be traced to a discriminatory purpose." *United States v. Lattimore,* 974 F.2d 971, 975 (8th Cir.1992) (quoting *Personnel Adm'r v. Feeney,* 442 U.S. 256, 272, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979)), *cert. denied,* —— .U.S. ——, 113 S.Ct. 1819, 123 L.Ed.2d 449 (1993). The phrase "discriminatory purpose" implies that the decisionmaker, the United States Attorney's Office in this case, selected "'a particular course of action

at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.'" *Id.* (quoting *Feeney,* 442 U.S. at 279, 99 S.Ct. at 2296). Ash and Johnson have presented no evidence that the United States Attorney's Office in the Eastern District of Missouri purposefully prosecutes blacks for cocaine-base offenses because they are black.

Additionally, Ash and Johnson argue that the legislative history of section 841(b)(1)(A)(iii) demonstrates that the section is irrational and that Congress had a discriminatory intent in enacting it. We have considered and rejected similar arguments. In *United States v. Buckner,* 894 F.2d 975, 980 (8th Cir.1990), we found that requiring more severe penalties for cocaine-base offenses than for cocaine-powder offenses is "rationally related to Congress's objective of protecting the public welfare." Congress considered "cocaine base to be more dangerous to society than cocaine because of crack's potency, its highly addictive nature, its affordability, and its increasing prevalence." *Id.* at 978. In *Lattimore,* we found that there is no evidence that Congress had a racially discriminatory motive in mind when it crafted extended sentences for crack felonies. 974 F.2d at 975.

Ash and Johnson also argue that the guideline ranges for cocaine-base offenses are racially discriminatory. We rejected a similar argument in *Lattimore, see id.,* and so Ash and Johnson's argument must also fail.

### III.

■ Ash and Johnson next argue that the warrantless entry into the residence violated the Fourth Amendment and that evidence observed following the entry should have been suppressed.

■ Police officers may not enter or search a home without a warrant, absent exigent circumstances. *See, e.g., Payton v. New York,* 445 U.S. 573, 589, 100 S.Ct. 1371, 1381–82, 63 L.Ed.2d 639 (1980); *United States v. Duchi,* 906 F.2d 1278, 1282 (8th Cir.1990). Under the exigent circumstances exception, the warrant requirement is suspended "when—in the press of circumstances beyond a police officer's control—lives are threatened, a suspect's escape looms, or evidence is about to be destroyed." *Duchi,* 906 F.2d at 1282 (citing *United States v. Clement,* 854 F.2d 1116, 1119 (8th Cir.1988)). The police themselves, however, cannot create the exigency. *Id.* at 1284.

The government argues that exigent circumstances existed when the transmitter indicated that the package had been opened. It contends that when the recipient of the package discovered that the package's contents had been altered and that the package contained a beeper, the cocaine base was in imminent danger of being destroyed.

So far as it goes, the government's argument is valid. We agree that the postal inspectors reasonably believed that evidence was in danger of being destroyed unless they immediately entered the residence. Nevertheless, in the light of *Duchi,* we find that the inspectors themselves created that danger.

In *Duchi,* the authorities removed one of two cocaine bricks from a package and replaced it with a book. An officer also initialed the other brick. Shortly after the package was taken into Duchi's residence, the police entered the house without a warrant because they feared that evidence would be destroyed. The government argued that the officers had properly entered Duchi's residence without a warrant because the parcel's altered contents made it likely that the evidence would be destroyed. *Duchi,* 906 F.2d at 1284.

In determining whether the police manufactured the exigent circumstances, we first examined the reasonableness and propriety of the investigative tactics that generated the urgent situation. *Id.* Employing this standard, we found that the heightened danger that the evidence would be destroyed was the probable result of the officers' removal and replacement strategy. *Id.* Because the danger of destruction was created by the officers' investigative strategy, we found that it could not justify their warrantless entry. *Id.*

Likewise, we find that the postal inspectors created the exigent circumstances in this case. As a matter of investigative strategy,

they substituted another substance for the cocaine base and placed the beeper in the package. By doing so, the inspectors created, or at least greatly increased, the risk that evidence would be destroyed. Had they not altered the package's contents, there would have been little or no danger of evidence being destroyed before they obtained the search warrant.

This case is distinguishable from *United States v. Johnson*, 904 F.2d 443 (8th Cir. 1990). In that case, a postal inspector found cocaine in a package. The inspector replaced the cocaine with other items and also placed a transmitter in the package. The authorities' plan to execute a controlled delivery was complicated by the fact that the package was addressed to one Albert Nixson at a non-existent address. The authorities determined that the address most similar to the one on the package belonged to Vernon Johnson. Shortly after the package was delivered, the transmitter's signal was completely lost, and the officers became concerned that it had been found and dismantled. Fearing that evidence would be destroyed, the officers entered the residence.

Johnson argued that the evidence seized upon entry should have been suppressed, claiming that no exigent circumstances were present to justify the warrantless entry. *Id.* at 445. In rejecting Johnson's argument, we found that the officers had not manufactured the exigent circumstances justifying the warrantless entry. *Id.* at 447. We emphasized that obtaining a valid search warrant for the residence would have been very unlikely as a result of the phony name and obscure address on the mailing label. *Id.* The officers did not know whether the address to which they had decided to deliver the package was the intended address. We stated that if the package had been addressed to a real person at a clearly identifiable address, we would have been less disposed to accept the government's claim of exigent circumstances. *Id.; see also United States v. Templeman*, 938 F.2d 122, 123 (8th Cir.1991) (stating that in *Johnson* the exigent circumstances primarily arose out of the uncertainty of the address on the package containing drugs), *cert. de-*

*nied,* —— U.S. ——, 113 S.Ct. 482, 121 L.Ed.2d 387 (1992).

In contrast to the facts in *Johnson*, the package in the present case was addressed to a clearly identifiable address, and the inspectors were able to obtain a search warrant shortly after it was delivered. Accordingly, *Duchi* rather than *Johnson* controls.

■ Because the warrantless entry violated the Fourth Amendment, the district court erred in not suppressing all evidence tainted by the illegal entry. From our review of the record, however, it appears that the only tainted evidence admitted at trial was testimony concerning the events that occurred in the bathroom immediately after the officers entered the residence. The untainted evidence against Ash and Johnson was overwhelming, and thus the admission of the tainted testimony was harmless beyond a reasonable doubt.

### IV.

■ We next examine the sentencing issues. Ash and Johnson argue that the district court erred in sentencing them pursuant to 21 U.S.C. § 841(b)(1)(A)(iii), which, as already discussed, provides that a person convicted of a drug offense involving more than fifty grams of a substance containing cocaine base shall be sentenced to a minimum of ten years' imprisonment. At their sentencing hearing, the defendants argued that the government had failed to establish that the substance mailed to them was cocaine base rather than cocaine powder. The district court rejected their argument.

■ The district court's determination that the substance at issue was cocaine base rather than cocaine powder is a finding of fact that we review for clear error. *See, e.g., United States v. Koonce*, 884 F.2d 349, 352–53 (8th Cir.1989) (upholding district court's finding that the methamphetamine at issue was Dextro-methamphetamine rather than Levo-methamphetamine). The government was required to establish only by a preponderance of the evidence that the substance was cocaine base. *United States v. Monroe*, 978 F.2d 433, 435 (8th Cir.1992). Having reviewed the expert testimony of Cheryl A.B.

Gardner, a forensic chemist for the United States Postal Service, we find that the government more than adequately demonstrated that the seized substance contained cocaine base. Gardner testified that her analysis indicated that the 211 grams of substance in the seventeen bags removed from the package was 69% cocaine base and that the twelve grams of substance in the bag left in the package was 67% cocaine base. Additionally, Gardner was present when the substance was reanalyzed, pursuant to the defendants' request, at an independent laboratory in St. Louis. She testified that the chemists at this laboratory had also found that the substance tested positive for cocaine base. The defendants offered no evidence to dispute Gardner's testimony.

■ Last, Ash argues that the district court erred in assessing him a criminal history point for an adult conviction in Virginia state court for possessing drug paraphernalia. On April 23, 1988, when Ash committed the offense, he was seventeen years old. Possessing the false identification of Jerry Cruz, an adult, Ash pled guilty to the charge as Cruz. On May 12, 1988, he was sentenced as an adult, receiving a twelve-month jail sentence, the execution of which was suspended, and two years' probation. Because he was a juvenile under state law when he committed the crime, Ash now argues that the adult conviction is void as a matter of law and should not have been counted in his criminal history score.

■ Whether a prior sentence counts for criminal history purposes is a question of federal law, not state law. *United States v. Rayner*, 2 F.3d 286, 287 (8th Cir.1993). Pursuant to sections 4A1.1(c) and 4A1.2(a)(3) of the sentencing guidelines, one criminal history point is added for a prior sentence, the execution of which was suspended. The guidelines clearly state that convictions such as the one Ash challenges here are under this general rule, for section 4A1.2(d)(2)(B) unequivocally provides that for offenses committed prior to age eighteen, "add 1 point under section 4A1.1(c) for each adult or juvenile sentence imposed within five years" of the commencement of the instant offense.

As Ash's adult sentence was imposed in May 1988, within five years of the instant offenses, the district court properly added one criminal history point for this conviction.

The convictions and sentences are affirmed.